IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-00031-03-CR-W-BCW |
| ) | |
| EDDIE CALDERON-ZAPATA, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Eddie Calderon-Zapata's Motion to Suppress Evidence (Doc. #72). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On January 25, 2019, the Grand Jury returned a two-count Indictment against defendants Miguel Cerros, Jose Louis Calderon-Zapata, Eddie Calderon-Zapata, Wilfredo Avalos-Pena, Adrian David Segura, Alfredo Garcia-Rodriguez, and Crystal Candela. On June 4, 2019, the Grand Jury returned a six-count Superseding Indictment against defendants Cerros, Jose Calderon-Zapata, Eddie Calderon-Zapata, Avalos-Pena, Segura, Garcia-Rodriguez, and Candela. The Superseding Indictment charges defendant Eddie Calderon-Zapata with Conspiracy to Distribute Methamphetamine (Count One), Conspiracy to Commit Money Laundering (Count Two), and Possession of Firearms in Furtherance of a Drug Trafficking Crime (Count Three).

An evidentiary hearing on the motion to suppress was held on September 12, 2019. Defendant Eddie Calderon-Zapata was represented by appointed counsel J. Justin Johnston. The

Government was represented by Assistant United States Attorney Bruce A. Rhoades. The Government called Officer Jacob Ramsey of the Kansas City, Missouri Police Department and Special Agent Trisha McCormick of the Federal Bureau of Investigation as witnesses. The defense called Sergeant Eric Greenwell of the Kansas City, Missouri Police Department and Deputy United States Marshal Paul Barry to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On February 6, 2019, Officer Jacob Ramsey, an officer with the Street Crimes Unit, was involved in executing an arrest warrant for Eddie Calderon-Zapata for charges relating to narcotics. (Tr. at 4, 5-6.) At 5:00 a.m., officers were briefed in regard to the arrest warrant for Calderon-Zapata. (Tr. at 6.) The officers were given a photograph of Calderon-Zapata. (Tr. at 19.) The officers were given the first-party address of 1112 Benton Boulevard, 2 South. (Tr. at 6.) The officers were advised that the structure was a multi-family structure, almost like an apartment building, except for the fact that Calderon-Zapata had access to the entire building. (Tr. at 7.) Officer Ramsey testified that Sergeant Eric Greenwell instructed the officers to make entry through what appeared to be a basement door on the east side of the structure. (Tr. at 6.)

2. At approximately 6:00 a.m., Officer Ramsey, along with five other officers on the Street Narcotics Tactical Response Team, arrived at 1112 Benton Boulevard in a warrant van. (Tr. at 7-8.) The warrant van had its emergency lights flashing. (Tr. at 7, 9.) The officers approached the basement door on the east side of the structure. (Tr. at 7.) Officer Ramsey was the point man, which meant that he would do the knock and announcing, be the first one through the door, and then guide the team as to their direction and route throughout the structure. (Tr. at 8.)

3. It was still dark outside, so the officers had lights shining on the door. (Tr. at 9.) As Officer Ramsey approached the door, he could see that it was partially open. (Tr. at 9.) Officer Ramsey knocked on the basement door and announced the officers' presence by saying something to the effect of "Police Department, Eddie Calderon, we have an arrest warrant." (Tr. at 8.) When Officer Ramsey knocked, the door swung open even further revealing a vestibule area with another door that appeared to be the front door of the basement. (Tr. at 9.) Officer Ramsey pushed open the vestibule door and then knocked and announced again at the front door of

the basement. (Tr. at 9-10.) There was no response. (Tr. at 10.) Officer Ramsey knocked and announced a third time, with still no response. (Tr. at 10.) The officers began to breach the door with a battering ram. (Tr. at 11.) The door had a hollow core, so the battering ram punched a hole through the door. (Tr. at 11.) Officer Ramsey then heard an adult male voice from inside the structure. (Tr. at 11.)

4. The officers stopped breaching the door and Officer Ramsey gave instructions for the person on the other side of the door to open it. (Tr. at 11.) The door opened and Officer Ramsey brought the person out. (Tr. at 11-12.) Officer Ramsey testified that this male (who appeared to be in his fifties) did not fit the description of Eddie Calderon-Zapata (who was in his twenties or thirties). (Tr. at 46-47.) The person was passed to the back of the line where he could be frisked for weapons and then passed off to a detective for debriefing as to who was in the building and what information they knew, so that the officers could gain some intelligence before they went inside. (Tr. at 12.) Officer Ramsey testified that once he passed the person off, he did not look at him. (Tr. at 13.) Since Officer Ramsey was up front, he must deal with what is in front of him. (Tr. at 13.) At this point, Officer Ramsey was focused on the "hot room," meaning that the officers had not yet been in the room and did not know if anyone else was hiding in there. (Tr. at 12-13.) Officer Ramsey called out again to see if anyone else was inside. (Tr. at 45.) Two females were called out of the basement area and passed back. (Tr. at 13, 45-46.) The officers then made entry in the residence announcing their presence as they moved throughout the basement of the structure. (Tr. at 13.) No other persons were encountered in the basement. (Tr. at 13.) The officers left the basement area. (Tr. at 13.)

5. While the officers were searching the basement area, they received a radio transmission from one of the perimeter security people for the task force which advised that a male was seen sticking his head out of a second floor south side window. (Tr. at 14.) After the team finished searching for Eddie Calderon-Zapata in the basement, Sergeant Greenwell instructed the team to attempt to make contact with the person seen at the window. (Tr. at 14-15.)

6. The team walked up to what appeared to be the common door to the structure which was unlocked. (Tr. at 15.) Officer Ramsey testified that there were opposing doors at the bottom of the stairs and then a landing with opposing doors at the top of the stairs. (Tr. at 15.) Officer Ramsey testified that he did not encounter anyone when he opened the main door and he did not knock on either of the doors on the first floor. (Tr. at 16.) Officer Ramsey ascended the stairs to the door that appeared to lead to the south side of the building on the second floor. (Tr. at 15.) Officer Ramsey was on the small second floor landing with one other officer standing behind him. (Tr. at 16.) The rest of the team was staged on the stairs. (Tr. at 16.) Officer Ramsey knocked on the door on the south side and announced

3

the officers' presence. (Tr. at 16.) Initially, there was no response. (Tr. at 16.) Officer Ramsey knocked and announced again, calling Eddie Calderon-Zapata by name. (Tr. at 16-17.) After knocking several times, Office Ramsey heard a male's voice from the other side of the south door. (Tr. at 17.)

7. At the same time that Officer Ramsey heard the male's voice from behind the south door, the door on the north side of the landing opened. (Tr. at 17.) The officer behind Officer Ramsey made contact with the people on the north side. (Tr. at 17.) Officer Ramsey gave verbal instructions to the male behind the south door to unlock the door, open the door, and then step back and get on the ground. (Tr. at 18.) As these instructions were being carried out, a couple of the officers from the stairs made entry into the front room behind the north door to stage behind Officer Ramsey. (Tr. at 18.)

8. Officer Ramsey then opened the south door. (Tr. at 19.) A male (later identified as Eddie Calderon-Zapata) was on his knees approximately six or seven feet from the door with his hands behind his head. (Tr. at 19, 40.) Officer Ramsey told the male to stand up, turn around, and walk backwards towards him. (Tr. at 20.) While the male matched the description that the officers had been given, Officer Ramsey made no attempt to identify the male or search him. (Tr. at 20, 54.) Officer Ramsey does not recall if the male had an ID in his hand. (Tr. at 79-80.) Just as with the persons located in the basement, the male was passed off to the officers behind Officer Ramsey. (Tr. at 20.) The male was taken to the adjoining apartment. (Tr. at 99-100.) A female and a child were then called out of the south door. (Tr. at 29-30.) The female and the child were also passed off to the officers behind Officer Ramsey. (Tr. at 30.) Officer Ramsey testified that this is standard procedure for the way they execute arrest warrants. (Tr. at 20.) Officer Ramsey testified that it his job to make sure it is safe, so he is focused on what is in front of him as far as looking for people and looking for things that might harm the team. (Tr. at 54.)

9. Officer Ramsey testified that his team was now split between two "hots" (that is two unknowns) and in a "fatal funnel" at the top of the stairwell where they were really confined in their movements. (Tr. at 21.) Officer Ramsey made the decision to make entry into the apartment and secure it through a protective sweep. (Tr. at 21.) As Officer Ramsey had not yet been notified as to whether the detectives had positively identified Eddie Calderon-Zapata, the entry would continue the search for Calderon-Zapata, as well as any other person hiding. (Tr. at 21, 59.) The officers systematically searched each room for a person. (Tr. at 22.) The officers only looked in places where a person could be hiding. (Tr. at 22.) Officer Ramsey testified that in the past, he has found people hiding under beds, in closets, under piles of clothes, and in cabinets. (Tr. at 22.) Sergeant Greenwell testified that he has found people in dryers, in washing machines, and most recently an armed person hiding in a refrigerator. (Tr. at 117.)

10. In the dining room, Officer Ramsey testified that he found what appeared to be a disassembled pistol on a windowsill. (Tr. at 23-24.) Officer Ramsey had moved the curtains which were hanging in front of the window. (Tr. at 64.) There was a dog barking behind a closed door, so the officers skipped that door and headed into the kitchen. (Tr. at 24, 27.)

11. Officer Ramsey testified that he searches dressers and cabinets starting with the top drawers. (Tr. at 26.) If he can open the top drawers and get to a point where he feels that a person cannot be hiding in there, he will not open the bottom drawers. (Tr. at 26.) Officer Ramsey testified that you do not know whether it is a voided space until you open a drawer. (Tr. at 26.) When searching for people, Officer Ramsey goes in with zero assumptions about what he is searching. (Tr. at 26.) He is merely looking for spaces where people can hide. (Tr. at 27.) While Officer Ramsey has not yet found anyone hiding in a dresser, he has seen them hiding in kitchen cabinets. (Tr. at 27.) While Officer Ramsey agreed that typically a person cannot hide in a drawer, he has seen what appeared to be drawers, but were instead cabinet doors. (Tr. at 27, 69.)

12. In the kitchen, Officer Ramsey first looked in the refrigerator and then opened some drawers and cabinets. (Tr. at 28, 68-69.) On cross-examination, Officer Ramsey testified that he cannot remember specifically if the drawers were already opened or if he opened them, but if the drawers were closed, Officer Ramsey said that he would have opened them. (Tr. at 75-76.) Officer Ramsey became satisfied that there was no one hiding in the kitchen. (Tr. at 28.) However, during the search for persons in the kitchen, Officer Ramsey took note of some items. (Tr. at 28.) Officer Ramsey observed two handguns and drugs or narcotics in a kitchen drawer. (Tr. at 73, 78.) Officer Ramsey observed two scales on the kitchen counter. (Tr. at 80.) Officer Ramsey left the items where he saw them. (Tr. at 28.)

13. From the kitchen, the team moved back to the door where the dog was barking. (Tr. at 29.) Officer Ramsey brought back the female who had been called out of the south apartment to corral the dog. (Tr. at 30.) She put the dog on a leash and took the dog out. (Tr. at 30.) Officer Ramsey then entered the hot room that the dog had exited. (Tr. at 30.) While searching for persons in that bedroom, the officers discovered a pistol under the mattress. (Tr. at 31.)

14. Given that the apartment had then been cleared for people, Officer Ramsey left the apartment. (Tr. at 33.) Officer Ramsey testified that he advised Sergeant Greenwell of items that he had seen in the apartment. (Tr. at 33.) Officer Ramsey told Sergeant Greenwell that he had seen a disassembled Glock pistol in plain view in the dining room on a windowsill. (Tr. at 75.) Officer Ramsey told Sergeant Greenwell that he had seen two fully automatic Glock pistols, a baggie

5

containing suspected marijuana, and a baggie containing suspected methamphetamine in a kitchen drawer. (Tr. at 75.) Officer Ramsey testified that as he was talking to Sergeant Greenwell, he believed that Special Agent Tricia McCormick was on the phone with Sergeant Greenwell. (Tr. at 74-75.)

15. Sometime after the yet to be identified male was removed from the south apartment to the apartment across the hall, but while the Street Narcotics Tactical Response Team was still clearing the south apartment, Sergeant Greenwell went up the stairs and had contact with the male, as well as several other persons. (Tr. at 100-01.) Sergeant Greenwell made no attempt to identify the individuals at that point as the operation was still in a tactical phase as opposed to an investigative phase. (Tr. at 102.) While a tactical phase is underway, officers keep conversation and air traffic to a minimum as lives are still in danger. (Tr. at 102.) Sergeant Greenwell considered lives to be in danger given that the officers were executing an arrest warrant for a person who was allegedly involved in a violent drug-trafficking organization. (Tr. at 102-03.) Eddie Calderon-Zapata was identified after the south apartment had been cleared, approximately thirty minutes after he was brought out of the apartment. (Tr. at 21, 107.)

16. Sergeant Greenwell testified that members of the tactical team told him that they had observed evidence in plain view in the apartment. (Tr. at 108-11.) The officers advised that they had observed some firearms along the windowsill, some guns in between a mattress, and some guns in the kitchen area. (Tr. at 111.) Sergeant Greenwell entered the south apartment after the tactical phase. (Tr. at 112.) Sergeant Greenwell observed two handguns and a green leafy substance in an open drawer in the kitchen. (Tr. at 112-13.) The handguns appeared to be fully automatic. (Tr. at 113.)

17. Special Agent McCormick was the affiant for a search warrant for 1112-1110 Benton Boulevard, Apartment 2S. (Tr. at 87; Gov. Exhs. 1, 2.) Special Agent McCormick was not at the scene when the arrest warrant for Eddie Calderon-Zapata was executed. (Tr. at 87-88.) Multiple arrest warrants were being executed that day and Special Agent McCormick could not be everywhere. (Tr. at 88-89.) Special Agent McCormick obtained information to draft the affidavit from Sergeant Greenwell and others on the scene. (Tr. at 88.) Special Agent McCormick testified that she initially talked to Sergeant Greenwell on the phone. (Tr. at 92.) Sergeant Greenwell walked Special Agent McCormick through everything that was in the apartment as she typed. (Tr. at 92.) As the Assistant United States Attorney had follow-up questions, Special Agent McCormick reached out to other folks on the scene to get clarification. (Tr. at 92.) At the time she swore to the affidavit, Special Agent McCormick believed the facts contained therein to be true and accurate. (Tr. at 89.) Special Agent McCormick has now determined that even though her affidavit states that the drawer in the kitchen was already open, the drawer was opened by law enforcement. (Tr. at

6

89-90.)

18. The Affidavit given in support of the Search and Seizure Warrant for 1112-1110 Benton Boulevard, Apartment 2S, Kansas City, Missouri provided in part:

 5. The Federal Bureau of Investigation (FBI), in cooperation with the Independence Police Department (IPD), Kansas City, Missouri Police Department (KCMOPD), and the Internal Revenue Services (IRS) initiated an investigation into a new clique of the East Side Locos violent gang operating in the Kansas City area. The investigation began in February 2015 into the gang and methamphetamine distribution activities of Miguel CERROS, Jose CALDERON, and Eddie **CALDERON**.

 6. A related Transnational Criminal Organization (TCO) investigation began in December 2016 into one of CERROS' drug suppliers Wilfredo AVALOS PENA. All four including Miguel CERROS, Jose CALDERON, Eddie **CALDERON**, and Wilfredo AVALOS PENA are actively involved in the distribution of illegal drugs in the Kansas City area.

 7. Since December, 2015, multiple controlled purchases of methamphetamine have been conducted from Miguel CERROS, Jose CALDERON, Eddie **CALDERON**, and Wilfredo AVALOS PENA through the use of a Confidential Human Source (CHS).

 8. On October 5, 2016, the CHS made a controlled purchase of $2,800 worth of methamphetamine from CERROS' associate Jose CALDERON and Eddie **CALDERON'S** residence located at 1112-1110 Benton, Kansas City, Missouri. CERROS and Jose CALDERON are associates, but have separate drug businesses. The drugs were delivered by Jose CALDERON'S brother Eddie **CALDERON**, but the deal was facilitated through Jose CALDERON. CHS obtained approximately 112 grams of methamphetamine for $2,800 from Jose CALDERON and Eddie **CALDERON**. When the CHS arrived at the 1112-1110 Benton residence Eddie **CALDERON** came outside and got into the CHS' vehicle. Eddie **CALDERON** pulled out a clear baggie of suspected methamphetamine from his pants pocket and gave it to the CHS. The CHS handed Eddie **CALDERON** the $2,800. The methamphetamine obtained from Jose CALDERON and Eddie **CALDERON** was sent to the Kansas City, Missouri Police Department lab to be tested. The lab test showed a positive result for 80% (+/- 5%) purity of methamphetamine.

 9. On January 25, 2019, a Grand Jury for the Western District of Missouri indicted Miguel CERROS, Jose CALDERON, Eddie **CALDERON**, and Wilfredo AVALOS PENA, and three other subjects for

7

Conspiracy to Distribute Methamphetamine and Conspiracy to Commit Money Laundering.

10. On February 6, 2019, arrest warrants were executed for Miguel CERROS, Jose CALDERON, Eddie **CALDERON**, and Wilfredo AVALOS PENA, and three other subjects. At time of this affidavit Miguel CERROS, Jose CALDERON, and Eddie **CALDERON** have been taken into custody.

11. On February 6, 2019, at approximately 6:21 a.m., an arrest warrant was executed for Eddie **CALDERON** at 1112-1110 Benton Boulevard, Apartment 2S, Kansas City, Missouri. Apartment 2S has utilities and United States Postal mail registered in Eddie **CALDERON'S** name. The perimeter team observed an unknown person look out the south window of a second floor apartment. Voice contact was attempted with the unknown person, but the person did not respond.

12. The arrest team entered the unlocked front, common door of the apartment building. The arrest team made voice contact with an unknown male who answered to the first name of Eddie. The arrest team up walked up the stairs to the second floor to Apartment 2S. The unknown male was instructed to come out of the apartment. The unknown male unlocked the apartment door and opened it. The unknown male stepped approximately five feet back inside the apartment. The arrest team called out the unknown male entered the apartment, and he was detained. The arrest team conducted a protective sweep of the apartment for additional persons. No other persons were located inside the apartment. During the protective sweep multiple firearms, suspected drugs, and drug paraphernalia were observed in plain view. The detained unknown male was later identified as Eddie **CALDERON**.

13. Found in plain view at the apartment were the following:

   a. In the dining room on the window sill was a disassembled Glock pistol.

   b. In the master bedroom: A Glock pistol under the bed, various clear baggies, and multiple live rounds of ammunition.

   c. In the kitchen observed in an open drawer were two fully automatic Glock pistols, a baggie containing suspected marijuana, and clear corner baggie containing suspected methamphetamine. A Special Agent with Alcohol Tobacco and Firearms (ATF)

8

observed the two Glock pistols and advised investigators the firearms were fully automatic.

d.   On top of the kitchen cabinet were two digital scales. One scale had white and green reside.

e.   In the kitchen next to the refrigerator were two rifles: A SKS model containing an extended magazine and one being an M-4 also containing a magazine.

f.   A small closet with no door and adjacent to the kitchen were observed two rifles: An assault rifle containing an extended magazine and an M-4 and it is unknown if contained a magazine.

g.   The same window where the unknown person looked outside was the same window in the kitchen next to the open drawer containing the two fully automatic Glocks.

(Gov. Exh. 1.)

19.   Sergeant Greenwell was present for the search of the residence. (Tr. at 115.)

## III.   DISCUSSION

Defendant Calderon-Zapata seeks to suppress all evidence seized from his person or the residence located at 1112 Benton Boulevard, Apartment 2S, Kansas City, Missouri. Defendant Calderon-Zapata's motion to suppress is based on the following argument:

> The TFO's searched Defendant's residence without a warrant, or any exigency justifying their entry into Defendant's residence after they had ordered him to exit his home and placed him under arrest. The stated pretext of conducting a "protective sweep" was not justified by any articulable facts, and was not reasonable under the totality of the circumstances. Furthermore, the warrant later obtained by the officers does not cure the taint of their initial illegal entry, because the warrant was issued primarily based on information obtained during the illegal entry and search of Defendant's residence. All items seized from Defendant's residence should be suppressed from evidence at trial.

(Doc. #73 at 4.)

Defendant Calderon-Zapata argues that after he was arrested, officers entered and searched

9

his residence without a warrant. While it is true that officers entered the apartment after the defendant (who had not yet been identified) was removed from the apartment, the Court finds that the officers entered the apartment for the purpose of executing the arrest warrant. "[U]ntil the point of [the defendant's] arrest the police had the right, based on the authority of the arrest warrant, to search anywhere in the house that [the defendant] might have been found." *Maryland v. Buie*, 494 U.S. 325, 330 (1990). As Officer Ramsey testified, because he had not been notified as to whether the detectives had positively identified Eddie Calderon-Zapata, the officers entered the south apartment to continue the search for Calderon-Zapata. (Fact No. 9.)

However, even if the officers knew or should have known that the person who had been removed from the apartment was Eddie Calderon-Zapata (which the Court does not find), the officers were justified in performing a protective sweep of the apartment after Calderon-Zapata was removed from the apartment. Sergeant Greenwell testified that he considered lives to be in danger given that the officers were executing an arrest warrant for a person who was allegedly involved in a violent drug-trafficking organization. (Fact No. 15.) Officer Ramsey testified that he believed his team was in danger given that they were split between two "hots" and in a "fatal funnel" at the top of the stairwell. (Fact No. 9.) In *United States v. Cash*, 378 F.3d 745, 749 (8th Cir. 2004), *cert. denied*, 544 U.S. 963 (2005), the Eighth Circuit Court of Appeals found that "an officer arresting a suspected drug trafficker in one room of a multi-room residence is justified in conducting a *Buie* sweep out of concern that there could be individuals lurking in the other rooms who may resort to violence to thwart the arrest." *Accord United States v. Green*, 560 F.3d 853, 856 (8th Cir.), *cert. denied*, 558 U.S. 879 (2009).

In *Maryland v. Buie*, 494 U.S. 325, 335-36 (1990), the Supreme Court held that a

10

protective sweep in conjunction with an in-home arrest is permissible if it is "a cursory inspection of those spaces where a person may be found" and "lasts no longer than is necessary to dispel the reasonable suspicion of danger." Based on Officer Ramsey's description of the search for persons that he conducted, that is the officers only looked in places where a person could be hiding,[1] and the systemic way in which the team moved through the apartment to clear each of the rooms (Fact Nos. 9 through 14), the Court finds the sweep of the apartment to be a limited search for the dual purposes of arresting Eddie Calderon-Zapata and maintaining officer safety. The Court further finds that the sweep lasted no longer than was necessary to accomplish these objectives.

During the search of the apartment for Eddie Calderon-Zapata (or the protective sweep for other persons), Officer Ramsey testified that he took note of some items. (Fact Nos. 12 and 13.) "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is 'immediately apparent.' *Horton v. California*, 496 U.S. 128, 136 (1990)." *United States v. Green*, 560 F.3d 853, 856 (8th Cir.), *cert. denied*, 558 U.S. 879 (2009). When Officer Ramsey searched the apartment for persons, by opening doors and drawers, lifting mattresses, or pulling aside curtains, he viewed firearms, illegal drugs, and drug paraphernalia in plain view. While the incriminating character of these items was immediately apparent to the officer, he did not seize them. (Fact No. 12.) Instead, he provided the information to his

---

[1] There was testimony relating to the opening of drawers in dressers and cabinets while searching for persons. Officer Ramsey testified that while a person cannot typically hide in a drawer, sometimes what appears to be a drawer is not actually a drawer, but instead a cabinet door. (Fact No. 11.) Officer Ramsey further testified that he goes in with zero assumptions about what he is searching and that he is merely looking for spaces where people can hide. (*Id.*) Officer Ramsey testified that he does not know whether there is a voided space until he opens a drawer. (*Id.*) The Court finds the testimony of Officer Ramsey credible as to his reasons for opening drawers and his methods for conducting a search for persons to be reasonable.

11

commanding officer and a search warrant was obtained using this information.

Defendant Calderon-Zapata argues that this search warrant does not cure the taint of the officers' initial illegal entry because the warrant was issued primarily based on information obtained during the illegal entry and search of the defendant's residence. (Doc. #73 at 4 and 6-7.) Given the Court's finding that the officers properly entered and searched defendant Calderon-Zapata's apartment in an attempt to execute the arrest warrant for Calderon-Zapata and/or to perform a protective sweep of the apartment during the execution of the arrest warrant, defendant Calderon-Zapata's argument must fail.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant Eddie Calderon-Zapata's Motion to Suppress Evidence (Doc. #72).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge